THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RALPH HARBOLD, Defendant-Appellant.

First District (5th Division)   No. 1—89—2849

Opinion filed September 30, 1991.

Michael B. Nash, of Chicago, and F. Lee Bailey, Kenneth J. Fishman, and Daniel P. Leonard, all of Bailey, Fishman & Leonard, of Boston, Massachusetts, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Gael M. O'Brien, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE LORENZ delivered the opinion of the court:

After his first conviction for murder was reversed on appeal and remanded for new trial (*People v. Harbold* (1984), 124 Ill. App. 3d 363, 464 N.E.2d 734), a jury again found defendant, Ralph Harbold, guilty of murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1)). He was sentenced to an extended term of 70 years' imprisonment and he now appeals. We consider the following issues: (1) whether the prosecutor made improper comments during closing argument which were not based on the evidence and prejudiced defendant; (2) whether the denial of defendant's motion *in limine* to exclude evidence was manifestly erroneous; and (3) whether defendant was denied a fair trial when he was limited to seven peremptory challenges under Supreme Court Rule 434(d) (134 Ill. 2d R. 434(d)). For the following reasons, we reverse and remand for new trial.

Prior to the second trial, defendant moved *in limine* to exclude a circular saw and expert testimony relating to blood splatters on the saw, arguing its probative value was outweighed by its prejudicial nature. The motion was denied.

Also prior to trial, when considering motions relating to the opinion reversing defendant's conviction, a judge warned the assistant State's Attorney regarding the presentation of motive evidence: "If you go into motive testimony at any time in your case in chief other than what I've ruled on, I'm going to hold you in contempt, I'm warning you now so we don't have any misunderstanding."

The following testimony from trial is relevant to our decision.

On March 31, 1981, at approximately 7 p.m., Frank Paul was stabbed several times in his business office. Covered in blood, he staggered to a restaurant across the street and told the owner, "I've been attacked." Paul lost consciousness and died within a short time.

Investigating the murder, the police found that the back door to Paul's office was open. Inside, a trail of blood led to a room where there was evidence of a struggle; however, there was no sign of a forced entry and nothing was missing.

In a search of the surrounding area outside Paul's office, the police found items which appeared to have blood on them. These items included a pair of rubber gloves, a knife, and a camel-colored sport

coat with keys to Paul's office in the pocket. The left-hand rubber glove had a cut in the area between the thumb and forefinger.

Dr. T.L. An, a pathologist, performed an autopsy on Paul. He testified that Paul received seven stab wounds and 10 cutting wounds, several of which indicated that Paul was attempting to defend himself. In An's opinion, the wounds could have been caused by a knife with a blade at least four inches long.

Michael Podlecki, a forensic scientist, testified that ABO blood-type analysis showed Paul's blood was type A and defendant's blood was type O. All the blood samples found at or near the scene were either type A or type O. Both type A and type O were found inside Paul's office and on the camel-colored sport coat. Type A was found on the knife, and type O was found on the rubber gloves. In addition to blood-type analysis, Podlecki testified that the impression in the blood on the knife was consistent with the pattern on the rubber gloves. In his amended report, he indicated that the cut in the web of the left-hand rubber glove was 11 centimeters long. Podlecki also testified that blond hairs found at the scene and on the knife were not consistent with defendant's hair, which was black.

Susan Perna, Paul's daughter, testified that defendant and his family were good friends of her family's.

Nancy Paul Horton, Paul's wife, who subsequently remarried, testified that she and defendant shared an interest in airplanes and collector's cars. Horton owned a business that operated two airports in Wisconsin and sold airplanes. Defendant purchased two airplanes from Horton's business and leased them back to the business. The week before Paul was murdered, she gave defendant a set of keys to start one of her cars in storage and defendant returned the keys within two days. The set included keys to Paul's office. Horton also testified that the camel-colored sport coat found outside Paul's office was the same type as a sport coat that defendant often wore.

Other members of Paul's family testified that after the murder, between April 1 and April 5, they attempted to contact defendant by telephone but could not reach him. Defendant did not attend Paul's funeral.

Several police officers also attempted to contact defendant at his home and at his office after the murder but were unsuccessful.

Marlene Harbold, defendant's sister, testified that beginning on April 5, she took care of defendant's children in his house because he was sick. She testified that defendant had a bandage on his left hand. Defendant told her he nicked his thumb with a saw and accidentally

cut the web of his hand, between the thumb and forefinger, with a butcher knife.

Ann Gover, defendant's employee, testified that defendant did not work from April 1 until April 7 because he had been sick. When he returned, she noticed a cut on his left hand in the web between the thumb and forefinger. Defendant told her he cut his hand while installing panelling.

On defendant's first day back at work, Officer Curtis Frost interviewed him in his office. When Frost first saw defendant, he noticed a cut on his left hand, a couple of inches long, between the thumb and forefinger covered by bandages. Defendant kept his left hand in his pocket for the rest of the interview. Defendant told Frost that he was at home, sick with the flu, for the past few days and did not answer the telephone. Defendant also said that although he had heard of Paul's death, he did not contact the family.

A search warrant was issued for defendant's house which was executed on April 10. Officer Terrence Conley testified that during the search he spoke with Marlene Harbold, who told him she had noticed defendant's left hand was bandaged. She also told Conley that defendant told her he injured the web between the thumb and forefinger while he was cutting a door with a circular saw. The police recovered the saw and the door, which appeared to have bloodstains on them however, they did not find defendant's camel-colored sport coat.

Mohammed Tahir, a forensic scientist, examined the bloodstain on the circular saw and found there was no blood in the teeth of the saw. In his opinion, the blood came in contact with the saw when it was not moving and the stain was consistent with touching the saw with a bloody finger or hand. The blood on the saw was type O, the same as defendant's blood type.

Dr. Joseph Danna examined defendant on April 10 pursuant to a court order. Defendant had two cuts on his left hand: one was on the web between the thumb and forefinger and the other was on his thumb. The cuts were one to two weeks old and occurred from the same event. The web cut, which showed signs of infection, was two inches long and should have been sutured. In Danna's opinion, the cuts appeared to have been caused by a knife and could not have been caused by a circular saw.

Tim Klier, a bank employee, testified that he saw defendant in the bank on March 31, the day Paul was murdered, and he did not have cuts on his left hand. Photographs taken by the security camera in the bank supported this testimony.

The State rested its case against defendant. Defendant presented the following witnesses.

Robert Farrell, a retired police officer, assisted in the investigation of Paul's murder. He interviewed a friend of Paul's who stated that the police or the Federal Bureau of Investigation spoke with Paul about another man, also with the last name Paul, who was suspected of transporting stolen cars.

Walter Sherk, a forensic scientist, testified that the lock on Paul's office had been tampered with at some time but he could not determine if the tampering was successful.

Janet Cook, a former employee of Paul's business, testified that at 5 p.m., on the night Paul was murdered, she saw a man with curly blond hair sitting in a parked car behind the office.

Maria Raspanti, also a former employee, testified that she did not remember ever seeing a man by the name of Martin Paul or describing him to police. She also testified that two months before the murder, police officers came to the office and spoke with Paul but she did not know what the conversation was about. She did not remember receiving a telephone call two days later from Martin Paul for Frank Paul.

The parties stipulated that Officer Frost would testify that Raspanti described Martin Paul to the police and told them that the police spoke with Frank Paul two months before his death about transporting stolen cars.

In closing argument, defense counsel argued that defendant had a friendly relationship with Paul and there was no evidence of a disagreement between them. Although he stated that motive was not required, he argued there was no evidence introduced to show why defendant would murder Paul.

In rebuttal, the assistant State's Attorney argued:

"And the defense has asked you about motive. Now, I told you right off from the start, we do not have to prove why he did it. Who knows what evil lurks in the hearts of men? I told you right from the start, all we have to do is prove that he did it. And I will show you beyond any reasonable doubt that he did it.

The defense counsel has asked [you to] think about why he might have done it. Well, maybe he admired Mrs. Paul from afar."

Defendant objected and the objection was sustained, but the assistant State's Attorney continued:

"The evidence shows that while Mr. Paul did not share Mrs. Paul's interest in aviation, this man did. This man had involvements with Mrs. Paul financially as well as through business: He purchased airplanes from Mrs. Paul, leased them back to Mrs. Paul. They shared the hobby of collecting classic T-bird cars. They both had their cars done by Mr. Wisniewski.

After the trial, go back to your parlors and your dens and you can talk about it at the local tavern and you can satisfy yourself and maybe think about why you think he did it; but the Judge is not going to instruct you that we have to prove one iota of evidence as to why. So let's keep on the track and not be distracted by the red herring."

The jury found defendant guilty of murder. The trial judge sentenced him to an extended term of 70 years' imprisonment based on a finding that the crime was exceptionally brutal and heinous. Defendant now appeals.

OPINION

Defendant has raised several claims of error. We consider first the issue of prosecutorial misconduct, which requires reversal of defendant's conviction.

Defendant argues that his conviction should be reversed because he was prejudiced by the prosecutor's improper comments in closing argument. Primarily, defendant complains that the State, although prohibited from introducing motive evidence during the trial, speculated on defendant's motive before the jury. In closing, the prosecutor stated, "maybe he admired Mrs. Paul [Horton] from afar." When defendant's objection was sustained, the prosecutor continued to comment on interests that defendant and Horton shared to the exclusion of Frank Paul. The State contends that the comments were a proper response to defendant's closing argument that the State did not prove motive. Also, the State contends that any prejudice was cured when the trial judge sustained defendant's objection to the comments.

Generally, the prosecutor has wide latitude in closing argument and may properly comment on the evidence presented at trial and legitimate inferences drawn from the evidence. (*People v. Smith* (1990), 141 Ill. 2d 40, 565 N.E.2d 900.) However, the prosecutor may not argue assumptions or facts not based on the evidence or present to the jury what amounts to his own testimony. *Smith*, 141 Ill. 2d 40, 565 N.E.2d 900.

In *Smith*, the supreme court held that it was improper for the prosecutor to argue to the jury that defendant committed murder for

gang-related retaliation when there was no evidence to support that argument. The court stated, "[a]bsent evidence tending to tie the State's 'motive evidence' to defendant, we perceive that the prosecutor's arguments could serve no purpose other than to 'inflame the passion or arouse the prejudice of the jury against the defendant without throwing any light on the question for decision.' " (Smith, 141 Ill. 2d at 62, 565 N.E.2d at 909, quoting People v. Dukes (1957), 12 Ill. 2d 334, 342-43, 146 N.E.2d 14, 18.) Defendant's conviction was reversed and remanded for new trial due to the cumulation of several errors including improper comment.

In People v. Mullen (1990), 141 Ill. 2d 394, 566 N.E.2d 222, which is analogous to the present case, the prosecutor commented in closing argument on evidence which was specifically excluded from trial. The supreme court found the improper comments were highly prejudicial. Although a prosecutor's comments on excluded evidence may not alone deny a defendant a fair trial, the court found that because the evidence at trial was closely balanced, the comments probably influenced the jury to return a guilty verdict. As a result, the court reversed and remanded for new trial based on the improper comments.

To resolve the issue presented, we must discuss the history of this case. Defendant's first conviction for Paul's murder was reversed and remanded for new trial based, in part, on the erroneous admission of motive evidence. (Harbold, 124 Ill. App. 3d 363, 464 N.E.2d 734.) Evidence was presented in the first trial purporting to establish a relationship between defendant and Horton from which the jury could infer defendant's motive for killing Paul. Without this evidence, the other evidence at trial did not indicate a reason for defendant to kill Paul. This court held that the evidence was inadmissible because it was too remote in time from Paul's murder and, as a result, defendant was substantially prejudiced, especially because the case was based entirely on circumstantial evidence. When defendant was retried, the State was precluded from presenting motive evidence and the prosecutor was warned not to inject motive evidence in the State's case in chief.

■ The prosecutor's comment that "maybe he admired Mrs. Paul [Horton] from afar" was not based on evidence presented at trial. It was pure speculation, as defendant noted in his objection, and supplied the jury with a motive in an otherwise closely balanced circumstantial case. When defendant's objection was sustained, the prosecutor continued his argument focusing on the shared interests of defendant and Horton. The implication of the comments was obvious. Without the suggestion, the evidence would not have led the jury to

that conclusion. Further, the comments were a back door attempt to present the jury with a motive when evidence of motive was specifically excluded from trial. We can only conclude that the prosecutor deliberately circumvented the court's ruling excluding motive evidence.

The State contends that the comments were made in response to defendant's comments that the State did not present a motive for defendant to have killed Paul. (See *People v. Dixon* (1982), 91 Ill. 2d 346, 438 N.E.2d 180 (defendant could not claim prosecutor's comments were improper when they were made in response to defendant's argument).) However, the proper response would have been to reiterate to the jury that the State was not required to prove motive as an element of murder. Instead, the prosecutor went a step further and offered a motive for the jury. The State also contends that any prejudice was cured when the judge sustained defendant's objection. (See *People v. Scott* (1990), 194 Ill. App. 3d 634, 551 N.E.2d 288 (sustaining objection and immediately instructing the jury to disregard improper comment cured prejudice).) In this case, the judge sustained the objection but did not immediately instruct the jury to disregard it.

Improper comment in closing argument will not justify reversal unless it resulted in substantial prejudice to defendant, considering the context of the language used, its relationship to the evidence, and its effect on defendant's rights to a fair and impartial trial. *Smith*, 141 Ill. 2d 40, 565 N.E.2d 900.

In this case, the improper comment, implying an illicit relationship between defendant and Horton, was not based on the evidence and inflamed the passion and aroused the prejudice of the jury against defendant. "[A]n insinuation which leaves the jury to speculate may be more prejudicial than erroneously admitted specific proof." (*People v. Emerson* (1983), 97 Ill. 2d 487, 497, 455 N.E.2d 41, 45.) Also, defendant's conviction rested solely on circumstantial evidence which was closely balanced and the impact of the comment on the jury was significant. The important task of deciding whether someone is guilty should not be influenced by an invitation to speculate as the prosecutor offered in this case when he used the word "maybe" and suggested a motive. As a result, defendant was substantially prejudiced and his conviction must be reversed and remanded for new trial.

Although not dispositive of this appeal, we also consider two other arguments defendant raised concerning issues that may affect his retrial.

Defendant argues that the denial of his motion *in limine* was manifestly erroneous. He moved to exclude the circular saw found in

his house and the corresponding expert testimony that the blood on the saw was placed there when the saw was not moving.

■ On appeal, he contends that the circular saw was not relevant at trial because there was no evidence linking it to the crime. He relies on Marlene Harbold's testimony that defendant told her he cut his left hand on a saw but she did not testify that it was a circular saw. Defendant ignores Officer Conley's testimony that Marlene Harbold told him that defendant told her he cut his hand on a circular saw. Based on this, there was sufficient evidence to link the circular saw to defendant's effort to conceal the crime and the evidence was relevant. The denial of defendant's motion *in limine* was not manifestly erroneous.

Defendant also argues that he was denied a fair trial when he was limited to seven peremptory challenges under Supreme Court Rule 434(d) (134 Ill. 2d R. 434(d)) rather than 10 peremptory challenges under section 115—4(e) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 115—4(e)). When defendant was first tried, he was allowed 10 peremptory challenges under section 115—4(e); however, at the time of his second trial, amendments to Rule 434 were in effect which reduced the number of peremptory challenges to seven.

■ Because section 115—4(e) directly conflicts with Rule 434(d) and the issue is a matter of court procedure, Rule 434(d) controls. (*People v. Colclasure* (1990), 200 Ill. App. 3d 1038, 558 N.E.2d 705.) As a result, defendant was properly granted seven peremptory challenges under the law in effect at the time of his second trial.

Reversed and remanded for new trial.

MURRAY and GORDON, JJ., concur.